[Cite as *State v. Collier*, 2016-Ohio-4951.]

COURT OF APPEALS
CUYAHOGA COUNTY, OHIO
EIGHTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. William B. Hoffman, J. |
| Plaintiff-Appellant | : | Hon. John W. Wise, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 103857 |
| ROSALYND COLLIER | : |  |
|  | : |  |
| Defendant-Appellee | : | OPINION |

CHARACTER OF PROCEEDING:      Criminal appeal from the Cuyahoga County Court of Common Pleas, Case No. CR-96-343947

JUDGMENT:      Dismissed

DATE OF JUDGMENT ENTRY:

APPEARANCES:

For Plaintiff-Appellant      For Defendant-Appellee

TIMOTHY J. MCGINTY
Cuyahoga County Prosecutor
T. ALLAN REGAS
ANTHONY T. MIRANDA
The Justice Center, 8th Floor
1200 Ontario St.
Cleveland, OH 44113

ROBERT TOBIK
Chief Public Defender
CULLEN SWEENEY
ERIKA CUNLIFFE
Assistant Public Defender
310 Lakeside Avenue, Ste. 200
Cleveland, OH 44113

*Gwin, P.J.*

**{¶1}** Plaintiff-appellant, the State of Ohio, seeks to appeal, with leave of court pursuant to R.C. 2945.67 and App.R. 5 a November 3, 2015 judgment of the Cuyahoga County Court of Common Pleas granting defendant-appellee, Rosalynd Collier ["Collier"], a new trial[1]. Because we find no abuse of discretion, and because the state has failed to sufficiently demonstrate a probability that its claimed errors did in fact occur, we deny the state's motion for leave to appeal and dismiss this appeal.

*Facts and Procedural History*

**{¶2}** In an indictment filed October 15, 1996, Collier was charged with thirty-four counts of rape of her minor daughter, A.Y. in violation of R.C. 2907.02. Counts 1-12 alleged offenses occurring between October 20, 1987 and October 19, 1988, counts 13-24 alleged offenses occurring between October 20, 1988 and October 19, 1989, and counts 25-34 alleged offenses occurring between October 20, 1989 and July 31, 1990. A bill of particulars filed December 31, 1996 indicated that these offenses occurred at hotels or motels in the greater Cleveland area, in Cuyahoga County, Ohio. *State v. Collier,* 8th Dist. Cuyahoga No. 76433, 2000 WL 1036305 (July 27, 2000) ["*Collier I"*].

**{¶3}** Before the trial began, the state nolled counts 13-34 and amended the remaining twelve counts so that counts 1-4 alleged offenses occurring between October 20, 1987 and October 19, 1988, counts 5-8 alleged offenses occurring between October 20, 1988 and October 19, 1989, and counts 9-12 alleged offenses occurring between October 20, 1989 and July 31, 1990. *Collier I.*

---

[1] Collier spelled her name for the record. (2T. Jury Trial, filed July 26, 2015 at 197). This is the correct spelling. The docket incorrectly spells Collier's first name, "Rosalind."

{¶4}  Prior to the start of trial, the State of Ohio took an interlocutory appeal from the trial court's pre-trial ruling permitting the defendants-appellees Rosalynd Collier and Reynard Hammond to introduce the results of Hammond's polygraph test in evidence under limited circumstances.  The trial court granted defendant's motion for admission of the polygraph test results for a limited purpose: if co-defendant Hammond took the stand and if his character put in issue, the polygraph examiner could testify not whether Hammond was telling the truth, but whether there were indicia of absence of deception in his answers to the polygraph questions.  *See, State v. Collier*, 8th Dist. Cuyahoga Nos. 73893, 73894, 1998 WL 398211(July 16, 1998) ["*Collier II*"].  The court of appeals reversed the trial court's ruling and held the results of the polygraph test was not admissible at trial because the parties had not stipulated to the test or its admissibility. Id.

{¶5}  The evidence at trial disclosed that the victim of these offenses, A.Y., was the daughter of Collier and Floyd Young and was born on October 20, 1983.  A.Y. testified Collier would force her to perform oral sex.  These incidents occurred three or four times per week at various motels on Euclid Avenue and at the house where they lived.  Most of the time, Collier would ingest cocaine immediately before these incidents.  Sometimes, Collier's boyfriend was present.  A.Y. testified that Collier would instruct her boyfriend to hit A.Y. with a belt when A.Y. refused, and he did so.

{¶6}  Following trial, the jury found Collier guilty of counts 1 and 2 of the amended indictment and not guilty of the remaining charges.  The court sentenced Collier to two concurrent terms of life imprisonment.  The court further found Collier a sexually oriented offender but not a sexual predator.  The convictions and sentences were affirmed on

appeal. *Collier I.* The Ohio Supreme Court granted Collier's motion for a delayed appeal. *State v. Collier,* 90 Ohio St.3d 1471, 748 N.E.2d 383(2000)(Table). Subsequently, the Ohio Supreme Court declined to exercise jurisdiction and dismissed the appeal. *State v. Collier,* 91 Ohio St.3d 1458, 743 N.E.2d 399(2001)(Table).

**{¶7}** On April 20, 1999, Collier filed her first motion for a new trial based on juror misconduct. After an evidentiary hearing at which Collier was represented by appointed counsel, the trial court overruled the motion on May 11, 1999.

**{¶8}** On May 14, 2015, Collier filed a motion for leave to file a motion for a new trial. The state filed a brief in opposition to the request on June 15, 2015, and Collier filed a reply brief on July 9, 2015.

**{¶9}** On July 15, 2015, the trial court set September 10, 2015 as the date for an evidentiary hearing on Collier's motion. On July 29, 2015, the trial court granted Collier leave to file a delayed motion for a new trial. The court informed the parties that it would consider the briefs already filed; however the parties could file supplemental briefs if they so desired.

**{¶10}** On August 31, 2015, the state filed a motion in limine to exclude 1). The polygraph examination results of the co-defendant Reynard Hammond from evidence; 2). Testimony related to the allegation of juror misconduct during the original trial and 3). Testimony from the trial judge who presided over the jury trial in 1999[2]. Collier filed a brief in opposition on September 8, 2015.

**{¶11}** The trial court granted the state's motion in part on September 10, 2015. Specifically, the trial court ruled that the results of the polygraph results were inadmissible;

---

[2] Collier had subpoenaed the Honorable Judge Eileen A. Gallagher, currently a judge sitting on the Eighth District Court of Appeals, and the presiding trial judge at the time of Collier's trial in 1999.

however the willingness of a party to take a polygraph test could be admitted; evidence of juror misconduct would not be allowed on the basis of res judicata; no witness would be allowed to vouch for the credibility of any other witness; and the testimony of the trial judge would be permitted but the scope of her testimony will be very limited, if ultimately permitted at all.

{¶12} The following facts were established at the evidentiary hearing on Collier's motion for a new trial which occurred on September 9, 2015, September 10, 2015, October 1, 2015 and November 2, 2015.

### A.     The Trial Phase of Collier's Case.

The general background facts and circumstances reveal that Collier had a turbulent relationship with Floyd Young and despite that fact, had a child together.  A.Y. was born October 20, 1983.  A.Y.'s early years were spent in less than desirable conditions.  Collier was using drugs, engaged in criminal behavior, and lived a nomadic life, moving often and staying in run down motels and hotels.

### 1. Trial Testimony of Ruby Young – Floyd Young's wife.

{¶13} A.Y. began to reside with Floyd Young sometime in 1990.  (2T. Jury Trial, filed July 26, 1999 at 145).  In 1990, Floyd Young began proceedings to establish paternity of A.Y. (Id. at 153-154).  Collier was sent to prison for robbery from 1991 to 1994.

{¶14} Floyd Young's wife, Ruby Young testified that she met A.Y.[3] when A.Y. was five years old.  (2T. Jury Trial, filed July 26, 1999 at 32; 135).  She discovered A.Y. masturbating at that time.  (Id. at 34).  This behavior continued after A.Y. came to live with Floyd and Ruby in 1990. (Id. at 35-36; 37; 67-68; 71; 88).  A.Y. was sent to Louisiana

---

[3] The exact nature of Floyd Young and Ruby Young legal status is unclear.  2T. Jury Trial, filed July 26, 1999 at 58.

sometime around 1990 to live with her grandmother for approximately one year.  (Id. at 38; 40; 96-97).

**{¶15}** Ruby Young testified that sometime around 1995, A.Y. answered the telephone and "Everything just went berserk."  (Id. at 42; 157-158).  A.Y. ran to her room and burst into tears.  At that point, A.Y. revealed to Ruby Young that it was A.Y.'s mother on the telephone.  (Id. at 43; 45).

**{¶16}** In December of 1995, Floyd Young contacted Children and Family Services. (Id. at 158-160).  A.Y. began counseling with Silke Pagendarm.  (Id.).  The history related to Ms. Pagendarm included A.Y. acting out with younger children.  (Id. at 163).  It was reported that A.Y. was taking excessive bathroom breaks at school.

### 2. Trial Testimony of A.Y. – victim.

**{¶17}** A.Y. was fifteen or sixteen years old at the time of trial.  A.Y. testified that Collier made A.Y. "place my lips against her vagina" which felt "nasty and wet."  (2T. Jury Trial, filed July 26, 1999 at 175; 179-180).[4]  This occurred three or four times "the week" until Floyd Young obtained custody of A.Y. when she was seven years old.  (Id.).  If she refused, Collier "would tell Ray to hit [A.Y.].  (Id. at 178).  Ray would hit A.Y. with a belt. (Id. at 179).  A.Y. testified that Collier taught her how to masturbate with her finger, telling A.Y. "it was the right thing."  (Id. at 183).

---

[4] Ordinarily we would not recite the specific sexual conduct or contact that was alleged to have occurred, especially in the case of a minor.  However, in this case no sexual conduct or contact ever occurred.  The victim admitted that the allegations were not true and the sexual conduct never occurred. In accessing the trial court's decision and the state's arguments, we must look to the specific evidence. What each witness specifically testified to at trial is of paramount concern when assessing the believability of recantation testimony.  Recanting witnesses are viewed with extreme suspicion. *Dobbert v. Wainwright*, 468 U.S. 1231, 1233-34, 105 S.Ct. 34, 82 L.Ed.2d 925(1984); *See, also*, State's Brief at 3 which recites this language.

**{¶18}** A.Y. testified that while she was in Louisiana with her grandmother A.Y. attempted to have oral sex with her female cousin. (Id. at 184; 207-208; 217- 218). The cousin told her mother, so A.Y. lied and said her father's friend taught her how to do it. (Id. at 184-185).

**{¶19}** A.Y. testified that after the phone call in 1995 she began to cry. (Id. at 188). She cried because Floyd told her that the person on the telephone was A.Y.'s mother. (Id.). Shortly after the phone call, A.Y. told Floyd and Ruby in the living room of their home that Collier made A.Y. perform oral sex. (Id at 189). A.Y. admitted that she was mad at her mother at that time.

**{¶20}** A.Y. began to see Silke Pagendarm for counseling.

**{¶21}** A.Y. testified she did not tell anyone about the abuse sooner because her mother said she would hurt her and she was afraid. (Id. at 237).

### 3. Trial testimony of Floyd Young - A.Y.'s father.

**{¶22}** Floyd Young testified that he and Ruby began to notice that A.Y. was masturbating. (2T. Jury Trial, filed July 26, 1999 at 247-248). Floyd Young obtained custody of A.Y. in July 1991. (Id. at 318; 332-333). Floyd's mother made him aware that A.Y. had attempted to act out sexually with A.Y.'s female cousin while in Louisiana in 1991. (Id. at 250; 294). After A.Y. returned from Louisiana, she was found with a younger girl and the younger girl had gotten undressed. (Id. at 253). In addition, the school was reporting excessive bathroom breaks by A.Y. (Id. at 254-255). Floyd testified that one occasion after A.Y. returned from Louisiana, A.Y. disclosed to Floyd that Collier had taught A.Y. how to masturbate. (Id. at 259).

{¶23} Floyd Young testified that in July 1995 A.Y. answered the telephone and handed it to him. When Floyd said "Rosalynd," "[A.Y.] shot out and ran upstairs and started crying…" (Id. at 256). Floyd Young testified that A.Y. told him about "oral sex" after Collier had telephoned. Floyd Young testified he immediately sought help for A.Y. (Id. at 262). A.Y. began seeing Silke Pagendarm for counseling from sometime in 1995 to 1996. The sessions began again in 1997 until April 10, 1998. (Id. at 262-263). A.Y. ran away from home at the time. (Id. at 266).

{¶24} Floyd Young testified that after Collier's phone call,

> After that, she start spilling a lot of things. "Daddy, sit down. I can talk about it now. My mama and Ray - - my mama used to put me between her legs and make me put my mouth on her vagina, and Ray was standing up over there with a belt. If I didn't do it, he'll rap me across my butt."
>
> This is what my kid told me.

(2T. Jury Trial, filed July 26, 1999 at 300)[5]. Floyd Young testified that during the telephone conversation Collier threatened to obtain custody of A.Y. saying Floyd would receive papers in the mail in a few days. (Id. at 317).

### 4. Trial testimony of Silke Pagendarm – A.Y.'s counselor.

{¶25} Ms. Pagendarm is a licensed professional clinical counselor. (2T. Jury Trial, filed July 26, 1999 at 337). Ms. Pagendarm is also the head of the Sex Abuse Treatment Team [SATT]. (Id.). Ms. Pagendarm testified that she first met with A.Y., Floyd and Ruby on October 30, 1995. (Id. at 342). She received the background information concerning

---

[5] *See,* note 4; It is necessary to show exactly what this witness testified to at trial because of his testimony on this subject at the hearing on Collier's motion for a new trial. See, *Third Proposed Assignment of Error, infra,* at ¶ 53- ¶55; ¶90 - ¶94.

A.Y.'s masturbation, acting out and sexual abuse by Collier. A.Y. told Ms. Pagendarm that A.Y. was having nightmares concerning the abuse. (Id. at 346). A.Y.'s initial diagnosis was posttraumatic stress disorder. [PTSD]. (Id. at 348). At Ms. Pagendarm suggestion, A.Y. wrote her a letter on February 6, 1996 detailing the abuse by her mother, including being forced to perform oral sex. (Id. at 352; 356). Based upon her training and experience Ms. Pagendarm testified to a reasonable degree of scientific certainty that A.Y. had been sexually abused. (Id. at 357).

### 5. Trial testimony of Detective Joseph A. Bensi.

**{¶26}** Detective Bensi of the Euclid Police Department testified the Cuyahoga County Department of Children and Family Services contacted his department in December 1997 concerning the sexual abuse of A.Y. (2T. Jury Trial, filed July 26, 1999 at 412). Detective Bensi took a Summary Report from Floyd Young. (Id. at 413.). He met with A.Y. in January 1996. (Id. at 414).

## B. Newly Discovered Evidence.

**{¶27}** Collier's motion for a new trial is based upon A.Y.'s recantation of her claim that Collier sexually abused her.

**{¶28}** In light of these allegations, the court scheduled an evidentiary hearing on Collier's Motion for New Trial. The hearing on Collier's motion for a new trial occurred on September 9, 2015, September 10, 2015, October 1, 2015 and November 2, 2015.

### Judge Eileen A. Gallagher – Trial Judge.

**{¶29}** Judge Gallagher was the trial judge in Collier's case. (T. Motion for New Trial, filed Jan. 11, 2016 at 45). Judge Gallagher testified that A.Y.,

> She was a reluctant witness in my opinion. She needed - - I felt she needed to be encouraged to testify and it seems to me that she was - - well, I probably shouldn't say that. I'll rule on my own objection.

(T. Motion for New Trial, filed Jan. 11, 2016 at 48).[6]  The judge based her testimony on her recollection of the trial, which took place over sixteen years ago. She did not review the trial transcripts. (Id. at 49). The judge spoke to the jurors after the trial. (Id. at 50). She testified,

> They always want to know if they did the right thing and I've never ever criticized a jury for their verdicts because it's not fair, but the question posed to me was now what's going to happen, and I said, well, she's going to be given a life sentence. The reaction to that was crying by a number of jurors and I said I have no choice. That's the law. It's a life sentence. And they - - that was pretty much the end of what I recall the conversation was.

(T. Motion for New Trial, filed Jan. 11, 2016 at 51). The trial judge testified that she denied Collier's previous motion for a new trial that was based upon juror misconduct. (Id. at 52). The trial judge on the motion for a new trial permitted the parties to proffer further testimony outside the presence of the court. (Id. at 54-59).

### 2. Reynard Hammond – Co-defendant.

{¶30} Hammond was Collier's co-defendant at trial. (T. at 73). The jury at trial acquitted Hammond. (T. at 72). Hammond testified he never witnessed Collier sexually abuse A.Y. (Id.).

### 3. A.Y. – Victim.

---

[6] State's brief at 5; 9-12.

**{¶31}**  A.Y. was 32 years old at the time she testified.  A.Y. testified that Floyd Young was,

> Strict.  He provided a roof, he provided food, but as far as anything else - - like the love was never there.  He was always very abusive; verbally, physically.
>
> * * *
>
> There was one incident where he smacked me across my left ear and I couldn't hear out of it for a week.

(T. Motion for New Trial, filed Jan. 11, 2016 at 91).  A.Y. claimed that the abuse from her father began whenever she would ask about Collier around the time she was 8 years old.  (Id. at 92).  A.Y. testified that when Collier called the home in 1995, A.Y. began to cry because Floyd Young told her she could not see her mother.  (Id. at 94 -95).  A.Y. denied that Collier ever forced her to perform oral sex on Collier.  (Id. at 95).  A.Y. testified that Floyd Young began telling her things that Collier had done to her after A.Y. had returned from Louisiana.  (Id. at 96).  A.Y. admitted that she lied to the police because she was mad at her mom. (Id. at 96-97).   A.Y. testified that Floyd Young told A.Y. that Collier performed oral sex on A.Y. (Id. at 98).  A.Y. testified that her father told her that he had witnessed Collier perform oral sex on A.Y. (Id. at 98).

**{¶32}**  A.Y. feared that her father would beat her unless she lied to the police.  (Id. at 99).  A.Y. testified that she did not tell Ms. Pagendarm,

> Because my father told me once again that nobody can protect me.  Nobody can save me.  He will find a way.  This is what I need to do.  This

is what happened. This is what I have to say. Anybody asks me questions about it, this is how you say it and this is the order it happened in.

(T. Motion for New Trial, filed Jan. 11, 2016 at 101).

{¶33} A.Y. testified that she ran away from home because her father was abusive. (Id. at 105). A.Y. admitted that she was not in Floyd Young's custody at the time she testified at Collier's jury trial. (Id. at 107). A.Y. admitted that she was living in a group home at that time. (Id. at 135). Eventually A.Y. was placed with a foster family. (Id. at 135). A.Y. ran away from the foster home. (Id.).

{¶34} A.Y. testified that nothing she told the police, Ms. Pagendarm or had testified to at trial was true. (Id. at 97; 101; 103; 108-110; 123; 151-156). Those were all things that her father told her to say. (Id. at 97; 101; 103; 108-110; 123; 151-156).

{¶35} A.Y. testified that she lied about attempting to have oral sex with her female cousin while in Louisiana. She testified that an older male cousin attempted to have sex with her. (Id. at 109-110). When she reported the incident, no one believed her. (Id.). At that point, A.Y. testified her grandmother and her aunt began to ask about a female cousin. (Id.). A.Y. testified that her grandmother and her aunt lied to her father about her attempting to have sex with a female cousin. She testified that she went along with the lie the pair told her father to stay out of trouble. (Id. at 110).

{¶36} A.Y. testified that after the trial Floyd lost custody of her. (Id. at 111). At that time, A.Y. was pregnant and in the custody of DCF. (Id.). A.Y. ran away from custody. A.Y. testified that in 2000 she left her infant son in Floyd Young's care because she was unable to care for him. (Id. at 137-138; 157). When A.Y. did not return, Floyd

turned over the child to social services. (Id. at 143; 157). She eventually lost custody of her child. (Id. at 112).

**{¶37}** A.Y. was married in 2002. She had five children. (Id. at 143). Those five children are not with A.Y. (Id. at 144).

**{¶38}** A.Y. testified that she had no recollection of Collier using drugs, staying out all night, teaching her to masturbate or leaving A.Y. and her sister alone for days at a time. (Id. at 97; 153-154). Those were all things her father made her say. (Id. at 154).

### 4. Deseree Collier – Sister of Collier and Aunt of A.Y.

**{¶39}** Deseree Collier is 17 years younger than her sister. (T. Motion for New Trial, filed Jan. 11, 2016 at 178).

**{¶40}** Deseree testified concerning Collier's 1995 telephone call to Floyd Young inquiring about Collier obtaining custody and visitation of A.Y. (Id. at 185).

**{¶41}** Sometime in November 2014, Deseree found A.Y. using Facebook. (Id. at 188). A.Y. was living in California. (Id. at 191). A.Y. responded by giving Deseree her telephone number. (Id. at 190). During a telephone call, A.Y. expressed her desire to return to Cleveland and get Collier out of prison. (Id.at 190). Deseree bought bus tickets for A.Y. and her three children to return to Cleveland, and A.Y. and her children has been living with Deseree and her husband ever since returning from California. (Id. at 191). A.Y. does not pay rent or contribute money to the household. (Id. at 193). A.Y. is unemployed. (Id. at 194).

### 5. Rosalynd Collier – Appellee/Defendant

**{¶42}** Collier denied raping or abusing A.Y. (T. Motion for New Trial, filed Jan. 11, 2016 at 198). Collier testified that Floyd Young was abusive, and that she was afraid of him. (Id. at 200). Collier was in prison for robbery from 1991 to 1994. (Id. at 207).

**{¶43}** Collier testified that she obtained Floyd Young's telephone number from a welfare office worker. (Id. at 209). She waited to make the call, which she made in the late spring or summer of 1995. (Id. at 210).

**{¶44}** Collier testified that Floyd Young was irate. The call ended with Collier telling Floyd Young that she would see him in court. (Id. at 211). Collier went to Legal Aid and began the process of obtaining custody of A.Y. the next day. (Id.).

**{¶45}** Floyd Young is not the father of A.Y.'s sister. (Id. at 215).

### 6. Floyd Young – A.Y.'s Father.

**{¶46}** Floyd Young admitted that he had struck Collier in the past. ((T. Motion for New Trial, filed Jan. 11, 2016 at 225). He claimed that Collier had also hit him. (Id.).

**{¶47}** Floyd testified that he and his wife had overheard A.Y. masturbating on numerous occasions. (Id. at 229). Floyd testified that "every little thing [A.Y.] said was a lie." (Id. at 230). Floyd testified that A.Y. was a, "Habitual liar." (Id. at 256). Floyd testified that he only used a belt to disciple A.Y. one time. (Id. at 231). On that occasion, A.Y. had stolen money from Ruby Young's purse. (Id.). That incident occurred close to the 1995 telephone call from Collier. (Id. at 231).

**{¶48}** Floyd Young testified that A.Y. revealed that Collier had sexually abused her after the 1995 telephone call. (Id. at 233). Floyd took A.Y. to counseling after the call. (Id. at 236). Those sessions may have been videotaped. (Id. at 237; 289).[7]

---

[7] No video recordings were offered into evidence at the hearing.

**{¶49}** Floyd Young testified that he was not present when the police interviewed A.Y. (Id. at 237). Floyd testified that he never told A.Y. what to say to the police or to Ms. Pagendarm. (Id. at 238). A.Y. was not in Floyd Young's custody at the time of trial. (Id. at 239).

**{¶50}** After the trial, Floyd Young testified that he and Ruby Young had visited A.Y. "quite a few times" after the birth of A.Y.'s first child. (Id. at 240). A.Y. left the child with Floyd and Ruby when she was no longer able to care for him. (Id. at 241). Floyd testified that he was planning to keep the child; however, the police removed the child for his home. (Id.).

**{¶51}** Floyd testified that A.Y. subsequently contacted him when she had been arrested for theft and he provided the money for her bond. (Id. at 242). Floyd ran into A.Y. in 2004 to let her know that Floyd's mother had passed away. (Id. at 243). That was the last time that Floyd saw A.Y. (Id. at 247).

**{¶52}** Floyd Young testified that A.Y. never told him that Ray Hammond would beat A.Y. with a belt if she did not perform oral sex on Collier. (Id. at 263). On cross-examination, Floyd denied ever witnessing A.Y. masturbating. (Id. at 268; 271).

**{¶53}** Floyd testified that the only thing A.Y. told him that Collier did to her was to teach her how to masturbate. (Id. at 277; 294). Floyd Young testified that A.Y. never told him that Collier forced A.Y. to perform oral sex on Collier. (Id.at 277; 278). Floyd Young testified that he never told the police that A.Y. had told Floyd that Collier had forced A.Y. to perform oral sex on Collier. (Id. at 278). Floyd Young testified,

>  Never told me that. [A.Y.] only told me that her mother taught her to do the thing she was doing.

Q.      You're talking about the masturbation?

The masturbation.

Q.      Okay.

And having affairs with little girls.

(T. Motion for New Trial, filed Jan. 11, 2016 at 278). Floyd Young testified that A.Y. never told him anyone had raped her. (Id. at 298).

{¶54} Floyd Young testified that he does not know what A.Y. told the police nor does he know what she testified to at trial. (Id. at 295; 299)

{¶55} Floyd Young testified that he never knew that Collier was attempting to regain custody of A.Y. (Id. at 285). It was never discussed or mentioned during the 1995 telephone call from Collier. (Id.).

**D. The Trial Court's Decision.**

{¶56} The trial court noted,

Collier's counsel attempted to introduce polygraph results for Collier and [A.Y.] but the Court has rejected such testimony since there was no stipulation to accept that information by the prosecution. Collier's counsel presented several witnesses to support their claim that Floyd Young was prone to violence to bolster the claim of fear by [A.Y.] Floyd Young admitted to such conduct when he was presented by the prosecution.

Floyd Young's testimony is of concern. At the hearing, and realizing 16 years has passed, his statements were inconsistent with his trial testimony and his statements to the Euclid police. At the hearing, he repeatedly testified that he did not know the specific conduct that [A.Y.] was

forced to perform on her mother. He was explicit in explaining it to the police. Now he claims that [A.Y.] never specifically told him the details nor did the therapist. Despite that claim, there is the pursuit of charges starting with Children and Family Services, followed by the Euclid police, Grand Jury, and indictment, and trial.

The police investigation began in December 1995 and the original indictments were filed October 15, 1996. The trial did not take place until March 29, 1999.

***

This motion for new trial is based upon the alleged victim in the case completely recanting her trial testimony 16 years after the trial. At least, on its face, the motion meets the six prongs set forth in [*State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370]. However, in reviewing the testimony and evidence presented, this Court is further directed to consider the standards for the review of recanted testimony.

* * *

Collier's motion for new trial meets the criteria for consideration of a new trial. The complete denial of any of the claimed activities which formed the basis of the original charges would change the result of a new trial. The change in testimony was only discovered recently and could not have been discovered at the time of the trial. It is clearly material to the issues in the case, it is not cumulative, and it is not in the form of impeachment or secondary evidence to contradict the former testimony.

The crux of the case is the believability of the testimony of [A.Y.] in conjunction with all the other evidence presented. [A.Y.'s] testimony was unequivocally the opposite of a trial testimony from 16 years ago. This was not a slight change or a different way of saying what happened. Her testimony was that none of the things she testified to in 1999 concerning sexual conduct by her mother ever occurred. In considering [A.Y.'s] testimony the Court took into account several factors. [A.Y.] had a troubled upbringing, had run away at least twice before the trial occurred, and she was characterized as a reluctant witness at the trial. Since the time of the original trial she had children, lost some of them to foster care, lived in California, and worked in door-to-door sales. She returned to Cleveland as a result of her Facebook contact with Desiree Collier.

In addition to those factors the Court considered several other issues. One was the highly contradictory testimony of Floyd Young, Mr. Young claims that he did not know the specific sexual conduct that allegedly occurred between [A.Y.] and Collier yet that is not what is contained in the police report. He did characterize [A.Y.] as a habitual liar yet believed that a 3 or 4 year old recalled the specific sexual conduct at issue.

The decision by the jury, while not a determining factor in this motion, is puzzling. [A.Y.] at trial, testified that this alleged conduct occurred repeatedly over a three year period. The jury somehow decided that it only occurred twice during the earlier period from October 20, 1987 through October 1988 when [A.Y.] was 3 and 4 years old. They acquitted Collier of

the two other counts for that same time period and acquitted her from the other counts that covered October 20, 1988 through October 1989 and October 20, 1989 through July 31, 1990, respectively.

Another issue raised by the State, while not dispositive of this motion, has to do with any claims of wrongful imprisonment should the Court grant a new trial. There is no basis for any claim of wrongful imprisonment available. This is not a case where there is any allegation of withholding information or any kind of misconduct. This entire motion centers upon completely opposite testimony from the alleged victim in the case 16 years after the trial. It is clear from the trial transcript, the subsequent appeals, and the evidence presented in support of this motion, there is nothing to indicate any conduct that would support a claim for wrongful imprisonment.

V. Decision

The Court has taken into consideration all the testimony provided at the hearing, the trial transcript, and the exhibits. The Court finds [A.Y.'s] testimony at hearing to be credible when taken in conjunction with all the other evidence in the case. For all the reasons set forth in this decision, the Court grants the motion for new trial.

*Standard of Review*

{¶57} Under R.C. 2505.02 and 2505.03(A), a trial court's order granting the defendant a new trial in a criminal case is a final appealable order, which the state may appeal by leave of court. *State v. Matthews,* 81 Ohio St.3d 375, 379, 1998-Ohio-433, 691 N.E.2d 1041.

**{¶58}** Granting or denying the state's motion for leave to appeal in a criminal case is solely within the discretion of the reviewing court. *State v. Fisher*, 35 Ohio St.3d 22, 517 N.E.2d 911(1988), paragraph two of the syllabus; *State v. Ferman*, 58 Ohio St.2d 216, 89 N.E.2d 843(1979); *State v. Matthews,* 81 Ohio St.3d at 378, 1998-Ohio-433, 691 N.E.2d 1041.

**{¶59}** The decision whether to grant a new trial on grounds of newly discovered evidence falls within the sound discretion of the trial court. *State v. Hawkins*, 66 Ohio St.3d 339, 350, 612 N.E.2d 1227(1993). We cannot reverse unless there has been a gross abuse of that discretion, and whether that discretion has been abused must be disclosed from the entire record. *State v. Petro,* 148 Ohio St. 505, 507- 508, 76 N.E.2d 370(1947), *quoting State v. Lopa*, 96 Ohio St. 410, 411, 117 N.E. 319(1917).

**{¶60}** A decision is unreasonable when it is "unsupported by a sound reasoning process." *State v. Abdullah*, 10th Dist. No. 07AP-427, 2007-Ohio-7010, ¶ 16, *citing AAAA Ents.*, *Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597(1990). "An arbitrary attitude, on the other hand, is an attitude that is 'without adequate determining principle; * * * not governed by any fixed rules or standard.'" Id., *quoting Dayton ex rel. Scandrick v. McGee*, 67 Ohio St.2d 356, 359, 423 N.E.2d 1095(1981).

**{¶61}** New trials are not to be granted lightly. *State v. Townsend,* 10th Dist. No. 08AP-371, 2008-Ohio-6518, ¶12. "'A more searching inquiry is required' if the new trial is granted than if denied, * * * because of 'the concern that a judge's nullification of the jury's verdict may encroach on the jury's important fact-finding function.'" *State v. Luckett*, 144 Ohio App.3d 648, 655, 761(8th Dist. 2001), *quoting Tri Cty. Industries, Inc. v. Dist. of*

*Columbia*, 200 F.3d 836, 840 (DC 2000), *citing Langevine v. Dist. of Columbia*, 106 F.3d 1018, 1023(DC 1997).

{¶62} Under App.R. 5(C), when the state seeks leave from the court of appeals to appeal an order or judgment of the trial court, its motion for leave must set forth the errors it claims occurred in the proceedings of the trial court. The motion must also be accompanied by affidavits or by the parts of the record upon which the state relies to demonstrate the probability that the claimed errors did in fact occur.  The state must also file a brief or memorandum of law in support of its claims.

*Proposed Assignments of Error*

{¶63} The state has set forth three proposed assignments of error,

{¶64} "I. THE TRIAL COURT ERRED IN CONSIDERING THE TESTIMONY OF THE HONORABLE JUDGE EILEEN A. GALLAGHER.

{¶65} II. THE TRIAL COURT ERRED IN ITS ANALYSIS OF WRONGFUL CONVICTION LAW AND THEREFORE ERRED IN ASSESSING THE CREDIBILITY OF A.Y.'S RECANTATION.

{¶66} III. THE TRIAL COURT ERRED IN GRANTING THE MOTION FOR NEW TRIAL."

I.

{¶67} In its first proposed assignment of error, the state contends, "the trial court erred in considering the testimony of the Honorable Judge Eileen A. Gallagher." *See,* State's Brief at 5; 9-12.  The state maintains whether A.Y. was reluctant at trial only has relevance to the extent it show A.Y.'s truthfulness at trial, which is improper opinion testimony.

**{¶68}** As appellee correctly notes, the reluctance of A.Y. as a witness is an observation that could be apparent to any individual who was present in the courtroom when A.Y. testified.  The judge did not testify that A.Y. was either being "truthful" or "untruthful."  Additionally, her reluctance to testify could be attributed to the sensitive nature of the sexual abuse allegations.  The testimony permitted does not disclose the judge's thought process.

**{¶69}**  In *Perkins v. LeCureux*, 58 F.3d 214 (6th Cir. 1995), cited by the state, the petitioner filed habeas corpus proceeding, alleging that petitioner's race had been impermissibly considered by the sentencing judge, based on remarks made by the state trial court judge in earlier habeas corpus proceedings involving a codefendant of petitioner.  The court held that a court speaks only through its minutes, and *testimony of mental processes of a judge* is not to be considered.  Id. at 219 (emphasis added).  In *Perkins*, the petitioner sought to attack his sentence based upon an examination of the trial judge as to why he gave the particular sentence in the case.  Id.

**{¶70}**  In *Proffitt v. Wainwright*, 685 F.2d 1227, 1255 (11th Cir.1982), cited by the state, the Court of Appeals ruled the district court on habeas petition should not have considered the state trial judge's post decision statements concerning the influence that various facts had on his decision to impose capital penalty.  The Court noted, "The judge's testimony was not limited to matters of basic, historical fact but directly addressed the effect of the psychiatric evidence on his sentencing decision.  Such post-decision statements by a judge or juror *about his mental processes in reaching decision* may not be used as evidence in a subsequent challenge to the decision."  *Proffitt v. Wainwright*, 685 F.2d 1227, 1255 (11th Cir.1982) (emphasis added).

{¶71} In the case at bar, the trial judge's testimony did not concern her mental process in reaching a decision. This case was tried to a jury and the jury decided it. Rather, the trial judge's testimony concerned a basic, historical fact observable by anyone present in the courtroom at the time.

{¶72} We note that had the trial judge remained on the common pleas bench and heard the motion for a new trial herself it would not be improper for her to have considered her own recollection of the witness demeanor during the trial.

{¶73} The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger,* 77 Ohio St.3d 415, 1997-Ohio-260, 674 N.E.2d 1159. Reviewing courts should accord deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections that cannot be conveyed to us through the written record, *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846(1988).

{¶74} In other word, had the trial judge herself presided over the 2015 hearing on Collier's motion for a new trial, no error could be assigned to her recollection of the trial witnesses demeanor, attitude or credibility,

> The trial judge is in a peculiarly advantageous position, under the prevailing circumstances, to pass upon the showing made for a new trial. He has the benefit of observing the witnesses at the time of the trial, is able to appraise the variable weight to be given to their subsequent affidavits, and can often discern and assay the incidents, the influences, and the motives that prompted the recantation. He is, therefore, best qualified to

determine what credence or consideration should be given to the retraction, and his opinion is accordingly entitled to great weight. If the rule were otherwise, the right of new trial would depend on the vagaries and vacillations of witnesses rather than upon a soundly exercised discretion of the trial court.

*Taylor v. Ross*, 150 Ohio St. 448, 452, 83 N.E.2d 222, 225 (1948), *quoting State v. Wynn*, 178 Wash. 287, 34 P.2d 900, 901(1934).

**{¶75}** Accordingly, the state has failed to sufficiently demonstrate a probability that its claimed error on this ground did in fact occur.

II.

**{¶76}** In its second proposed assignment of error, the state argues the trial court incorrectly concluded that Collier was precluded from filing a wrongful conviction claim and this error of law affected its assessment of the credibility of the recantation. [State's Brief at 13].

**{¶77}** The state cites to no portion of the record to demonstrate the motivation of A.Y.'s recantation is based upon a belief that Collier can file a wrongful imprisonment claim. In the case at bar, the trial court specifically found the issue of wrongful imprisonment was raised by the state and is "not dispositive of this motion."

**{¶78}** The Ohio Supreme Court has held that a party should be provided an opportunity to cross-examine a complaining witness regarding a potential financial motivation created by a pending or contemplated lawsuit,

An accused is permitted to cross-examine the prosecuting witness as to the witness' pending or contemplated civil action against the accused,

in order to demonstrate any possible bias or prejudice arising out of the witness' financial interest in the outcome of the prosecution.

*State v. Ferguson*, 5 Ohio St.3d 160, 450 N.E.2d 265(1983), paragraph three of the syllabus.

{¶79} In the case at bar, the state was permitted to inquire of the witnesses concerning a possible wrongful imprisonment suit. (T. Motion for New Trial, filed Jan. 11, 2016 at 79; 196). Notably, however, the state never asked Collier herself if she had discussed or contemplated filing a wrongful imprisonment claim if her motion was granted. Nor did they ask A.Y. if this was her motivation in recanting, or if she discussed a wrongful imprisonment claim with Collier or anyone else.

{¶80} We will not infer that the motivation for the recantation is the filing of a wrongful imprisonment claim. The state failed to present any evidence beyond a mere suggestion.

{¶81} Accordingly, the state has failed to sufficiently demonstrate a probability that its claimed error on this ground did in fact occur.

III.

{¶82} In its third proposed assignment of error the state contends that the trial court erred in granting Collier's motion for a new trial.

{¶83} The state contends that A.Y.'s trial testimony was corroborated in several ways. [State's Brief at 14]. First, A.Y. told her father, her therapist and the police. She wrote a letter to her therapist detailing the abuse and she testified at trial when she was no longer under her father's custody. In addition, the testimony of Silke Pagendarm corroborates that A.Y.'s trial testimony should be believed.

{¶84} Crim.R 33, which provides the procedure for obtaining a new trial, states in part,

(A)     Grounds

A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

(1)     Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;

(2)     Misconduct of the jury, prosecuting attorney, or the witnesses for the state;

(3)     Accident or surprise which ordinary prudence could not have guarded against;

(4)     That the verdict is not sustained by sufficient evidence or is contrary to law. If the evidence shows the defendant is not guilty of the degree of crime for which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict or finding accordingly, without granting or ordering a new trial, and shall pass sentence on such verdict or finding as modified;

(5)     Error of law occurring at the trial;

(6)     When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the

hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

**{¶85}** "To warrant the granting of a motion for a new trial on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result of a new trial if granted; (2) has been discovered since the trial; (3) is such as could not in the exercise of due diligence have been discovered before the trial; (4) is material to the issues; (5) is not merely cumulative to former evidence; and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370(1947), syllabus. *Accord, State v. Hawkins*, 66 Ohio St.3d 339, 350, 612 N.E.2d 1227(1993), syllabus; *State v. LaMar*, 95 Ohio St.3d 181, 2002–Ohio–2128, 767 N.E.2d 166, ¶ 85.

**{¶86}** Courts have also noted, "'[r]ecantation by a significant witness does not, as a matter of law, entitle the defendant to a new trial.'" *State v. Covender*, 9th Dist. Lorain No. 07CA009228, 2008–Ohio–1453, ¶ 12, *quoting State v. Walker*, 101 Ohio App.3d 433, 435, 655 N.E.2d 823 (8th Dist.1995). Implicit in these standards is the fact that trial courts must evaluate credibility in deciding the motion. If trial courts could not evaluate the credibility of recanted testimony, every recantation after trial would result in a new trial.

**{¶87}** The United States Supreme Court has expressed disfavor for granting new trials based upon recanted testimony:

Recantation testimony is properly viewed with great suspicion. It upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction. For these reasons, a witness' recantation of trial testimony typically will justify a new trial only where the reviewing judge after analyzing the recantation is satisfied that it is true and that it will "render probable a different verdict.

*Dobbert v. Wainwright*, 468 U.S. 1231, 1233–34, 105 S.Ct. 34, 82 L.Ed.2d 925 (1984) (Brennan, J., dissenting from denial of certiorari). Recanting witnesses are viewed with extreme suspicion. *United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001); *United States v. Chambers,* 944 F.2d 1253, 1264 (6th Cir.1991), *superseded in part on other grounds by U.S.S.G. § 2D1.5(a).*

{¶88} "On a motion for new trial based upon grounds of newly discovered evidence, the trial court, when considering the recantation of the prosecution's primary witness, must make two findings: (1) which of the contradictory testimonies of the recanting witness is credible and true, and if the recantation is believable; (2) would the recanted testimony have materially affected the outcome of the trial?" *Toledo v. Easterling*, 26 Ohio App.3d 59, 498 N.E.2d 198(6th Dist. 1985), paragraph three of the syllabus. *Accord State v. Williams*, 2nd Dist. Montgomery No. 19854, 2004-Ohio-3135. ("[N]ewly discovered evidence which purportedly recants testimony given at trial is 'looked upon with the utmost suspicion.'"); *State v. Isham*, 2nd Dist. Montgomery No. 15976, 1997 WL 24794(Jan. 24, 1997). Thus, if the trial court is satisfied that the trial testimony is true,

it need not proceed to the second question to determine the probability that the new evidence will change the original result. *Toledo v. Easterling, supra*; *See, also, State v. Curnutt*, 84 Ohio App. 101, 84 N.E.2d 230 (1st Dist. 1948), paragraph three of the syllabus ("Where a new trial is sought upon the ground that a witness subsequently stated that he gave perjured testimony, the question is, when did the witness tell the truth? Recantation by an important witness of his or her testimony at the trial does not necessarily, or as a matter of law, entitle the defendant to a new trial * * *."); *State v. Smith*, 8th Dist. Cuyahoga No. 100588, 2014-Ohio-4799, ¶11.

{¶89} In the case at bar, there is no doubt that A.Y. recanted. She testified that she only said Collier had raped her because Floyd Young had told her Collier did and A.Y. was afraid of Floyd Young.

{¶90} The trial court, however, was not faced solely with A.Y.'s recantation. In this case, Floyd Young clearly and unequivocally told the police that A.Y. had told him Collier forced A.Y. to perform oral sex on Collier. If he had not, it is clear that no rape charges would ever have been initiated. It was only after Detective Bensi spoke to Floyd, that he interviewed A.Y.

{¶91} Floyd Young testified at trial that A.Y. told him that A.Y. told him about "oral sex" after Collier's 1995 telephone call. (T. Jury Trial filed July 26, 1999 at 260). He gave a detailed account of when, where at what transpired during the conversation in which A.Y. told him that Collier had forced A.Y to perform oral sex. (Id. at 300). Floyd testified at trial that during that telephone call Collier had threatened to obtain custody of A.Y. saying that Floyd would receive papers in the mail. (Id. at 317).

**{¶92}** However, during the hearing on the motion for a new trial, Floyd Young denied A.Y. ever told him that Collier had forced A.Y. to perform oral sex on Collier; denied that he ever told the police anything about oral sex; denied that he knew what A.Y. had told the police and denied that he knew what A.Y. testified to at trial. (T. Motion for New Trial, filed Jan. 11, 2016 at 277-278; 295; 298- 299). Floyd Young denied that he ever told anyone that A.Y. had told him that Ray Hammond would beat A.Y. if she did not perform oral sex on Collier. (Id. at 263). Floyd Young further denied that during the 1995 telephone call, Collier threatened to obtain custody of A.Y. (T. Motion for New Trial, filed Jan. 11, 2016 at 285).

**{¶93}** This new evidence in the form of A.Y. recantation and Floyd Young's denials disclose a strong probability that it will change the result if a new trial is granted.

**{¶94}** It is clear that the allegations of oral sex arose after Collier's 1995 telephone call to Floyd Young. It is probable that Collier informed Young that she was going to seek custody of A.Y. There is no doubt that Floyd Young then told the police that A.Y. had informed him that Collier had raped her. Floyd Young never claimed that he lied during his trial testimony or that he was recanting what he testified too during Collier's jury trial. He flat out denied ever having knowledge of the rape allegations. It would appear then, that Floyd Young was attempting to shift the blame for the commencement of criminal charges against Collier solely to A.Y.

**{¶95}** Ms. Pagendarm's treatment of A.Y. focused upon A.Y.'s masturbation. There is no testimony from Ms. Pagendarm that A.Y. ever made any subsequent disclosures of rape or gave any significant details concerning the oral sex. The fact that

A.Y. engaged in masturbation is not evidence that Collier forced A.Y. to perform oral sex on Collier. Ms. Pagendarm did not testify at the hearing on Collier's motion for a new trial.

{¶96} In reviewing the trial court's decision to grant Collier's motion for a new trial under an abuse of discretion standard, and keeping in mind that we cannot substitute our judgment for that of the trial court, we cannot say that the trial court acted unreasonably, arbitrarily, or unconscionably in granting Collier a new trial. Therefore, we find the trial court did not abuse its discretion in ordering a new trial on the basis of newly discovered evidence. We also find the state failed to sufficiently demonstrate a probability that its claimed errors on this ground did in fact occur.

*Conclusion*

{¶97} The state has failed to sufficiently demonstrate a probability that the trial court erred when it granted Collier's motion for new trial. Accordingly, we deny the state's motion for leave to appeal. The state's appeal is dismissed.

By Gwin, P.J.,

Hoffman, J., and

Wise, J., concur

                                                    _____
                                                    HON. W. SCOTT GWIN


                                                    _____
                                                    HON. WILLIAM B. HOFFMAN


                                                    _____
                                                    HON. JOHN W. WISE


WSG:clw 0516

IN THE COURT OF APPEALS FOR CUYAHOGA COUNTY, OHIO

EIGHTH APPELLATE DISTRICT

STATE OF OHIO                          :
                                       :
          Plaintiff-Appellant          :
                                       :
                                       :
                                       :
-vs-                                   :          JUDGMENT ENTRY
                                       :
ROSALYND COLLIER                       :
                                       :
                                       :
          Defendant-Appellee           :          CASE NO. 103857


For the reasons stated in our accompanying Memorandum-Opinion, the state's motion for leave to appeal is denied and the state's appeal is dismissed.  Costs waived.


_____
HON. W. SCOTT GWIN


_____
HON. WILLIAM B. HOFFMAN


_____
HON. JOHN W. WISE